## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,                )
                                         )
                Plaintiff,       )
                                         )
v.                                       )
                                         )        **Case No. 15-cr-20077-02-CM**
SARAH ROBINSON,                          )
                                         )
                Defendant.       )
_____  )

## MEMORANDUM AND ORDER

Defendant Sarah Robinson is charged with (1) being a felon in possession of a firearm and (2) knowingly disposing of a firearm to an illegal alien. (*See* Doc. 8 (counts 3 and 4).) Defendant's Motion to Suppress (Doc. 28) is before the court. On June 13, 2016, the court heard argument and testimony, and accepted evidence at the hearing on the motion. The court took the matter under advisement and is now ready to rule.

### I.    Background

This case involves a police encounter with defendant Sarah Robinson and co-defendant Cesar Flores-Navarro that occurred at a motel in Lenexa, Kansas late at night on August 3, 2015. The court discusses the complicated factual background in detail below.

#### A.  Events Leading up to Initial Encounter

On August 3, 2015, around 11:00 p.m., Lenexa canine police officer Ryan Sumner was patrolling the parking lot of a Motel 6 in Lenexa, Kansas, when he noticed a Ford Windstar parked slightly across two stalls.[1] Officer Sumner ran the plate on the van, and it returned to a Mitsubishi

---

[1] Officer Sumner testified that he patrolled the Motel 6 parking lot for "proactive enforcement" purposes. He stated that the motel district, where this motel was located, attracts transients and

registered to a Sarah Robinson, now known to be defendant here.  Because of the inconsistency

between the plate registration and the vehicle, Officer Sumner decided to investigate by speaking to the

motel manager, Tara Latham.  Ms. Latham informed Officer Sumner that defendant had two rooms

rented under her name, and that she was staying in room 139.[2]

Officer Sumner decided to initiate contact with defendant in her motel room, but before he did,

two events occurred:  (1) Officer Chris Cogswell joined Officer Sumner; and (2) Officer Sumner used

a flashlight to look through the windows of the van and noticed a small glass pipe in the driver's side

door, which he associated with marijuana use, and a butane torch, which he associated with

methamphetamine use.

Before initiating contact with defendant, Officers Sumner and Cogswell activated their "body

cams," which are devices that attach to their uniforms and create contemporaneous digital audio and

visual recordings of the events.  The body cams may be turned off by flipping down the cover.  The

court has reviewed Officers Sumner's and Cogswell's body cam recordings that were entered into

evidence.  Where there were slight discrepancies between or gaps in the officers' testimony and the

digital recordings, the court has used the digital recordings for these facts.

### B.  Initial Encounter with Defendant Sarah Robinson and Co-Defendant Flores-Navarro

Around 11:25 p.m., Officer Sumner, with Officer Cogswell accompanying, initiated what is

called a "knock and talk" by knocking on the door of room 139.  From behind the door, defendant

asked who it was, and Officer Sumner announced that it was the police department.

Defendant answered the door, Officer Sumner asked if they could come in, and defendant said

yes.  A Hispanic male, now known to be co-defendant Cesar Flores-Navarro, lay across one of the two

---

narcotics and other illegal activity.  He said he usually makes a "big circle around the parking lot
looking for any indicators of criminal activity."
[2] Room 139 is on the ground level of the motel.

beds in the room (the one closest to the door).  Officer Sumner immediately asked if there were any children in the room.  Defendant responded that there were not; that her sister had picked up her kids. Officer Sumner asked whether the brown van outside was defendants.  Defendant said yes, and then Officer Sumner asked if she knew it was illegally parked.  Defendant apologized and said she would go move it.  Officer Sumner confirmed that she was Sarah Robinson and asked defendant if she just had her tags transferred.  Defendant explained that she had just bought the van and the dealer said she could use the tag from her trade-in vehicle for up to 30 days.[3]  Officer Sumner said that was fine.

Officer Sumner then said to Officer Cogswell, about one minute and twenty seconds after knocking, "Would you mind waiting here with him, I'm going to show her her car real quick."  He did not ask defendant whether that was okay, and defendant did not object.  Officer Sumner then told defendant that he was going to flip the security lock so that the door would not close.  Defendant said that was fine.

Although Officer Sumner later testified that he smelled cigarette smoke and saw a burned out cigarette immediately upon walking in the room, neither officer mentioned this to either occupant at this time.

### C.  Officer Sumner's Continued Encounter with Defendant by her Vehicle

When they walked out to the car, Officer Sumner asked defendant whether she or the man in the motel with her parked the car.  She said she had parked it, apologized, and said she could fix it. Officer Sumner did not respond, instead asking her whether there was any marijuana in the vehicle because there was a marijuana pipe in the door.  Defendant said the pipe was not hers, and immediately opened the door to get it.  Defendant explained that her sister had found it on her 18-year-old son, and that defendant's sister was distraught, so defendant had told her sister to give it to defendant when her

---

[3] At the hearing, Officer Sumner agreed that this is legal.

sister had picked up defendant's children that evening.  The pipe was unused.  Defendant offered it to Officer Sumner saying that she did not want it.  Officer Sumner said he would dispose of it if defendant wanted.  Defendant gave the pipe to Officer Sumner and said that she had been planning to dispose of it.

Officer Sumner asked if he could get her information for his report because he had made contact with her.  Defendant agreed, and then said that she was surprised he did not know her.  She referred to an incident, later described in more detail by Officer Sumner at the hearing, where defendant had been in the news because defendant, who was homeless, had tried to steal diapers, diaper wipes, and shoes for her six children from a Wal-Mart in Roeland Park, Kansas.  When an officer apprehended her, he decided to pay for the items himself instead of arresting her.  Media outlets covered the event, which prompted charitable donations from the public.  A trust was set up for defendant as a result.  She explained that the trust was how she was able to stay in the motel.  Officer Sumner asked for her basic information, including her name, birthdate, mailing address (which was at her mother's home), and cell phone number.  Defendant volunteered that she had a warrant for a broken windshield.  Officer Sumner asked if that was out of Kansas City, Kansas, and upon defendant's confirmation, he said he was not worried about it.

Officer Sumner also asked for the name of the man in the motel room with her.  She said and spelled Julio Balbuena, although it is now clear his name was actually Cesar Flores-Navarro.  Officer Sumner asked for his birthdate and asked whether he was defendant's boyfriend.  She agreed that he was her boyfriend and admitted that he had a long-term relationship with another woman.  Defendant could not remember whether his birthday was January 14 or 18 in 1980.  Officer Sumner said he would ask him.

Officer Sumner then asked defendant whether there was anything illegal in the room. Defendant said no.  Officer Sumner said that he was concerned because of what was in the vehicle, and he asked whether he could search the motel room.  He asked defendant if she "would mind" letting him search the room.  Defendant said yes (meaning that she would mind allowing him to search), and added, "not that it would matter."  As this interaction was occurring, defendant was walking back into the motel room, and Officer Sumner followed her in.  Officer Sumner did not ask for permission to walk back into the room, and defendant did not object.  Officer Cogswell and Flores-Navarro were still in the room, and Flores-Navarro was still on the bed.

### D.  Officer Cogswell's Continued Encounter with Flores-Navarro in Defendant's Motel Room

In the meantime, while defendant and Officer Sumner had left the motel room, the following interaction occurred between Officer Cogswell and Flores-Navarro.  Officer Cogswell asked for Flores-Navarro's name, and he answered it was Julio, but then said it was Cesar.  He did not give a last name.  Officer Cogswell asked how long they were staying, and Flores-Navarro said they were leaving the following day.  He said they were going to Wyandotte the following day, and they were in the area for his girlfriend (defendant) to maybe look at a house to buy the following day.  They discussed defendant's children and that they had been dating for one year.

During this encounter, Flores-Navarro continued laying on the bed, and appeared to be interested in his cell phone, looking up at Officer Cogswell only to answer questions.  There were long pauses in the conversation.  Flores-Navarro never left his bed.  Although Flores-Navarro could speak and understand English, his understanding seemed limited as he frequently asked Officer Cogswell to repeat his questions.

This encounter lasted approximately three minutes and twenty seconds before defendant walked back in the room with Officer Sumner following close behind.

### E.  Defendant and Officer Sumner's Return to the Motel Room

Upon walking back into the motel room (with Officer Sumner close behind), defendant began speaking in Spanish to Flores-Navarro.  Defendant asked Officer Sumner how he knew the pipe was in the van, and he told her because he could see it through the windshield.  After continuing to speak in Spanish with Flores-Navarro, defendant said no to the search.  Officer Sumner asked again whether there was anything illegal in the room.  Defendant said no again.

Officer Sumner asked Flores-Navarro how to spell his "nombre," after addressing him as Julio. Flores-Navarro said his name was Cesar.  Officer Sumner showed him the name defendant had spelled for him and asked if his name was "like that," and Flores-Navarro agreed.  Officer Sumner asked if Flores-Navarro had any identification on him, which Flores-Navarro denied.  Officer Sumner asked again for his name and asked him to spell it.  Then he asked him to write it.  He said his name was not Balbuena.  Defendant asked, "What is it, Navarro?  He has so many different Facebooks, sorry."  At this point, defendant picked up a cigarette and walked out to the parking lot to smoke.

### F.  Defendant and Officer Cogswell's Continued Encounter Outside of the Motel Room

Officer Cogswell backed out of the door in front of her.  He asked defendant whether they were dating, and defendant said yes, but explained that Flores-Navarro had a long-term girlfriend he lived with whom he referred to as his wife.  She said they had been dating off and on since they were 15, but this last time for a few months.  She said she knew he had two last names, but she explained that she just said what was on his Facebook.

Defendant volunteered to Officer Cogswell that "she should have never took it," explaining to the officer that her sister had found the pipe on her sister's son, as she had explained to Officer Sumner minutes before.  Officer Cogswell asked how long they would be staying.  She asked whether she was going to get a paraphernalia charge for having the pipe, and Officer Cogswell said that would be up to

Officer Sumner.  She explained that they were just trying to take it away from her sister's son.  Officer Cogswell asked if she did drugs at all, and she said no.  He asked if she smoked at all, and she said no, she did not want to have her kids taken away.  She said she does not drink alcohol and that she only smokes cigarettes.  He asked how many kids she had, and she answered six, and told him about the Roeland Park police officer who started the charitable trust for her, explaining that she was homeless.  She explained that the trust fund paid for the motel rooms wherever there are vacancies in the area.  He asked where they were going after that evening and she explained that she was hoping to look at homes the following day in the area.

Defendant, gesturing to the motel room, asked whether Flores-Navarro had done anything wrong, and Officer Cogswell said no, Officer Sumner was just making sure he does not have any weapons on him.  Officer Cogswell asked defendant whether Flores-Navarro had any weapons, she answered no.  Officer Cogswell asked defendant whether Flores-Navarro normally carries weapons, and she said only a small knife that she lost when they were in a fight.  This conversation between Officer Cogswell and defendant lasted about five minutes.

### G.  Flores-Navarro and Officer Sumner's Contemporaneous Continued Encounter Inside of the Motel Room

Meanwhile, after Officer Cogswell had followed defendant outside of the motel room, Officer Sumner was continuing to talk with Flores-Navarro inside of the motel room.

Also during this time, Officer Sumner asked Flores-Navarro if he could run his name to see if he had any outstanding warrants, and Flores-Navarro agreed.  Officer Sumner asked Flores-Navarro if he had a wallet, and then Flores-Navarro gave his wallet to the officer.  Officer Sumner asked if he could look inside for identification, and Flores-Navarro agreed.  Officer Sumner found a taped-up Mexican voter registration card that did not have a photograph on the front.  Officer Sumner continued to ask Flores-Navarro about his identity, and Flores-Navarro said he did not have a Social Security

number.  Consequently, Officer Sumner believed that Flores-Navarro was not legally in the United States.  He ran Flores-Navarro's name using several different spellings of Flores-Navarro's name and found he had some outstanding warrants.

Officer Sumner asked Flores-Navarro if he had anything illegal on him, which Flores-Navarro denied.  Officer Sumner asked if he could check to see if there was anything illegal on him, and Flores-Navarro agreed.  As Flores-Navarro got off the bed, he reached back towards the pillow and pushed it down.  Officer Sumner told Flores-Navarro not to reach there, and asked what was there.  Flores-Navarro denied anything was there.  Officer Sumner asked if there was a pistol, and Flores-Navarro said there was not.  Officer Sumner asked if he could reach in Flores-Navarro's pocket, and Flores-Navarro agreed.  Officer Sumner asked Flores-Navarro if he minded stepping outside for a second, and Flores-Navarro did after defendant told him to step outside where she was.  As Flores-Navarro was walking out, he kept looking at the pillow, and Officer Sumner was concerned Flores-Navarro was concealing a weapon.

### H. Officer Sumner's and Defendant's Continued Encounter Outside of the Motel Room

At this point, Officer Sumner asked Officer Cogswell if he would talk with Flores-Navarro outside because he wanted to talk with defendant.  Officer Sumner then asked defendant if he could talk with her, and she agreed.  They walked over to where the van was parked, out of earshot of Flores-Navarro and Officer Cogswell.  Officer Sumner told defendant that Flores-Navarro was acting suspicious when he got up, and he also said his name was not Julio, but it was Cesar.  Defendant seemed surprised that defendant had a different first name because she had known him since she was a teenager and had always known him as Julio.  Officer Sumner received a radio transmission informing him of Flores-Navarro's warrants.

Officer Sumner then asked defendant if there was a gun in the room because it looked like Flores-Navarro was hiding something.  She said no.  She said he would not have a gun.  Defendant continued to be surprised that his name was Cesar.  Officer Sumner said that full honesty would keep her from getting into trouble.  Defendant said that she was being honest with him, and that there was no way he could have a gun.  Officer Sumner asked again for her cooperation.  Defendant said the reason she did not want to let him search under the pillow was because she "did not want to be alone."  Officer Sumner said he would not "rat her out," but again said he would like her consent to search the room.  She declined, saying that Flores-Navarro said no.  She said he had a knife, which she had lost, but she would know whether he had a gun.

Officer Sumner then shifted the topic for the first time to defendant's smoking in the room.  He said, "And you know there's no smoking inside buildings in Lenexa, right?"  Defendant first said no, and then admitted that she did know she should not have smoked in the motel room.  Officer Sumner then called for backup on his radio.  Defendant said she would clean up the ashes and that she brought Febreeze.  He told her, "Well, you're going to have to stand by, okay?  For a second."  She said okay. He said he would like to talk with Flores-Navarro some more, if that was okay with defendant.  He said that he thought Flores-Navarro was putting something under the pillow, and that they were not supposed to smoke in the room because it was against city ordinance and motel policy.  He said that he was good friends with management at the motel, and said they are cooperative with the police.

Notably, then defendant offered to leave the motel room.  Officer Sumner did not respond.

Defendant then pled with Officer Sumner that her "kids need this house."  Officer Sumner said that he understood "but with the way he was acting . . ."  (ellipsis indicating unfinished sentence in audio).  Defendant then suggested to Officer Sumner that Flores-Navarro was nervous because he did

not want to be deported.  Officer Sumner asked her whether, if Flores-Navarro consented to the search, she would.  Defendant said she would, but she just did not want to go against him.

Officer Sumner then asked whether she had anything illegal in the car.  Defendant said no. Officer Sumner asked if he could search the car, and defendant said no and that it was up to Flores-Navarro.  Officer Sumner then asked "whether Flores-Navarro had that much control over [defendant] when [she did not] even know his real name."  She insisted that his name was Julio and walked a few steps to her van to show Officer Sumner a book with his name in it.  He said that he understood, while shining his flashlight into the van.  Defendant then said she did not understand, and started to walk from the driver's side door of her van to the sidewalk directly in front of the van, approximately ten feet from Officer Sumner.  While she was walking, Officer Sumner asked whether his dog would alert if he ran him around her van and immediately asked, "Do you mind standing over here?  Is that okay?" Defendant walked back to Officer Sumner and said no to his question about the dog alerting.  Then she asked if she was going to get in trouble for the glass pipe in her van.  She asked to call her sister to have her sister verify that it was not defendant's pipe.  Officer Sumner said that he "wasn't saying she was going to get in trouble for the pipe.  It's just a pipe."  He said that he was not going to arrest her for a "weed pipe."  He said he was not too concerned about that, but that he was "more concerned about the way that you guys were acting in the hotel [sic] room, um, and the way he was acting on that bed."  She asked whether Officer Sumner spoke Spanish, and he said a little.  Then he said that Flores-Navarro "spoke pretty good English."  Officer Sumner said he wanted to speak to Flores-Navarro a bit more.  Defendant said, "Yeah, well, I'll just stand over here," while stepping onto the sidewalk. Officer Sumner said, "Well, let's keep talking because I need another officer here."  Defendant stepped back towards Officer Sumner.  Officer Sumner said he wanted to go talk to management as well.

Defendant noted that she was confused that Flores-Navarro could speak English.  Officer Sumner said, "Someway or another, I am going to have to . . . I mean, you guys are doing something illegal inside the room."  Defendant asked whether she could go to jail for smoking inside a motel room, and Officer Sumner said, "I'm not going to take you to jail for smoking a cigarette in a hotel [sic] room.  It's an ordinance violation."  Defendant said, "It's a ticket and I'll have to pay money."  Officer Sumner said, "I may not write you a ticket, either."  Officer Sumner asked if she was okay because Flores-Navarro seemed controlling.  She said she was.  Then, Officer Wohmer arrived, and Officer Sumner asked whether he would mind standing with defendant while he went to talk with Flores-Navarro.

### I. Officer Cogswell's and Flores-Navarro's Continued Encounter Outside of the Motel Room

While Officer Sumner was talking with defendant, Officer Cogswell stood outside with Flores-Navarro, asking him about his background, vehicle, age, children, and work history.  There were long periods of silence at times, and Flores-Navarro did not move other than to eventually sit down.  Officer Wohmer arrived after about twelve minutes and as noted above, Officer Wohmer stood with defendant while Officer Sumner walked over to talk with Flores-Navarro.

### J. Flores-Navarro's and Defendant's Continued Encounter with Officers Cogwell and Wohmer

Officer Sumner walked over to Flores-Navarro and Officer Cogswell.  Officer Sumner told Flores-Navarro, "Cesar, you can stand up if you like."  Flores-Navarro said, "huh?" and Officer Sumner repeated "You can stand up if you like," while motioning for him to stand up.  Flores-Navarro stood up.

Officer Sumner asked Flores-Navarro if he still had his voter identification, and Flores-Navarro stated that he did not have it.  Upon realizing that it was not in Flores-Navarro's wallet, Officer

Sumner shined his flashlight into the motel room on the bed where Flores-Navarro had been laying, saw the voter registration card, and asked if he could go get it. Flores-Navarro said yes. Officer Sumner walked into the room, took the card off of the bed, and brought it outside. Officer Sumner read the card, which said, "Cesar Flores," and asked why defendant thought his name was Julio. He said his friends call him Julio. Officer Sumner asked if Flores-Navarro was married, and he said no, and that he lived with defendant now.

Officer Sumner asked Flores-Navarro what he had under the pillow. He said he had a cord for his phone or headphones. Officer Sumner asked if it was okay if he looked under the pillow, and Flores-Navarro pointed to defendant, who was standing about 15 feet away, against the wall, waiting as she had been directed by Officer Sumner.

### K. Officer Cogswell's and Officer Wohmer's Joint Interaction with Flores-Navarro

After Officer Sumner left to talk again with defendant, Officer Cogswell and Officer Wohmer stood with Flores-Navarro for a few seconds. Defendant and Officer Sumner walked back to where Flores-Navarro was standing with Officers Cogswell and Wohmer, and defendant spoke in Spanish to Flores-Navarro. Flores-Navarro answered her in Spanish. Officer Sumner asked defendant if she could ask Flores-Navarro whether he could search under the pillow, defendant spoke with Flores-Navarro in Spanish. Then, defendant asked Flores-Navarro in Spanish whether he spoke English, he said not much in Spanish, and Officer Sumner said in English that he seemed to understand it pretty well. Flores-Navarro responded "no." Officer Sumner said that he understood that just fine.

Defendant said she "was going to say no to the search" because she did not have anything illegal, Flores-Navarro did not have anything illegal, and there was no reason for it. Flores-Navarro spoke to defendant in Spanish, and defendant said Flores-Navarro was asking about their privacy rights because they had just smoked a cigarette in the room. Officer Sumner said that they did have a pipe in

the door of the vehicle, and defendant responded that it did not have anything in it.  Defendant explained again why and how she had the pipe, and that it was unused.  Officer Sumner said to defendant, "Do you mind standing over here, I want to talk with this officer," pointing to nearby Flores-Navarro, who was still standing against the wall with Officer Cogswell directly facing him within a few feet.  Officer Sumner stepped away to talk with Officer Wohmer, while defendant followed his direction and stood with her back against the wall next to Flores-Navarro.

Flores-Navarro spoke with defendant, and defendant translated, questioning Officer Cogswell about their privacy and how it was that officers could come in just because she was smoking a cigarette.  She said it was obvious they had not been smoking marijuana, because you cannot hide the smell of that.  Officer Cogswell agreed and said that it was not even what they were worried about.  He said that when people have a pipe in the car, usually that means there is another one or something to go in it.  She again offered to have them call her sister to verify how she received the pipe.  Officer Cogswell again said that Flores-Navarro was acting nervous "when he got up."  She said that he is Hispanic and implied that most of the Hispanics she knows are nervous in nature.  Officer Cogswell agreed that it is a different culture.  Defendant said that it also makes people nervous because they do not want to get a ticket and have to pay money.  She asked Flores-Navarro again how much English he spoke, and he answered her in Spanish.

Officers Sumner and Wohmer returned to the pair and Officer Cogswell, and Officer Sumner asked, "Do you guys mind waiting right here, I'll be right back," and defendant responded, "Yeah, yeah, that's fine."  Officer Wohmer began talking with defendant while standing outside with them about smoking in the room and how they signed the agreement.  Defendant said that she was the one smoking in the room, not Flores-Navarro.  Officer Wohmer asked defendant how much property they had in the room, and defendant stood up from the wall and pointed in the room, saying how much was

there.  Officer Wohmer asked about whether she was homeless, and about her children.  Officer

Cogswell asked how old defendant was, and she said 34.  Officer Wohmer asked how old Flores-

Navarro was, and he said 35.  Officer Wohmer said, "So you do speak English," and Flores-Navarro

said, "A little."

Defendant said something, which is not clear on the video, and looked into the room.  She

tentatively stepped slightly into the room, Officer Wohmer said, "Do you know what it is," and then

defendant walked back to her place on the wall.  Defendant found her identification in her back pocket,

and asked if they wanted to see it.  Officer Wohmer said that they did not need it if she already gave

her information to the other officers.  Upon Officer Cogswell's asking if she had a driver's license or

just an ID, she explained that she had a driving infraction warrant for the broken windshield, so her

license had been suspended, but that the trustee for her trust account was going to pay the ticket, so she

would have a license again soon.  Defendant started talking about her background, and who had her

children for the evening, when the motel manager, Tara Latham, and Officer Sumner arrived.

### L.  Officer Sumner's Discussion with Motel Manager Tara Latham

Meanwhile, Officer Sumner turned off his body camera after he left Flores-Navarro and

defendant with Officers Cogswell and Wohmer.  Therefore, there are no recordings before the court of

Officer Sumner's initial interactions with Ms. Latham.  However, Officer Sumner testified that the

purpose of speaking with Ms. Latham was to tell her "her what I observed in the room.  She knew we

were already down there, so in regards to the smoking, I told her about that, I mean, because honestly

that's all I had, was they were smoking in the room."

As Officer Sumner and Ms. Latham were walking back to the officers, defendant, and Flores-

Navarro, he turned on his body camera.  He stated, "I can't force you to kick them out, it's up to you.

I'm just telling you what you like us to tell you, which is what we did inside a room."  Ms. Latham

said that if they were smoking in the room, it is against policy, and it is damaging the room, so they need to go.  Officer Sumner stated that it was completely up to her whether she wanted their assistance, and she said she did.  He said he wanted to make sure he wasn't using her, and she agreed he was not, and if anything, she was using him.

### M. Motel Manager Tara Latham's Interactions with Defendant, Flores-Navarro, and Officers Sumner, Cogswell, and Wohmer

When Ms. Latham and Officer Sumner arrived, defendant immediately admitted that she had been smoking in the room.  Ms. Latham said that they would have to check out.  Defendant asked if they would have to charge the room, and Ms. Latham responded that she would not, but that she would have to leave and would not be able to rent from them again.  Officer Sumner asked, "Do you guys want to gather your belongings?"  Defendant went in the room.  To Flores-Navarro, he turned and asked "Do you want to gather your belongings?"  Flores-Navarro followed defendant into the room. At that time, Ms. Latham asked whether there were actually two adults in the room, because Flores-Navarro was not actually registered.  Defendant admitted that he would have stayed with her and was not registered, but noted that they were leaving regardless.  Defendant walked out of the room to bring a bag of her belongings to her van.  While defendant was placing the bag within her van, Flores-Navarro walked out of immediate sight of the officers, and Ms. Latham peeked into the room. Defendant came back from the van with a nearly empty shopping bag.  She added a few things to the bag and had a brief discussion with Flores-Navarro.  She told him that "it didn't matter," as Flores-Navarro walked out of the room.  Officer Cogswell followed Flores-Navarro to the van, and Flores-Navarro put something in the van, and closed the door, and returned to the motel room.  Officer Cogswell followed him back to the motel room.

Defendant stated that she did not understand why they were in so much trouble.  Ms. Lantham responded that they were breaking policy and damaging the room.  Officer Sumner responded that

anytime they contact anybody, management "expects a report because it is their hotel [sic]."  Ms. Lantham asked if she needed assistance putting everything in a bag, and defendant said no.  Defendant and Flores-Navarro exchanged some words in Spanish.  Officer Sumner motioned to Flores-Navarro and said, "Since you're not a guest, why don't you just come on out.  She can get the rest of the stuff."  Defendant said that Flores-Navarro wanted to change his pants before leaving, because they were wet in the front.  Ms. Lantham said that she just wanted them to leave, but they could do whatever they wanted after they left.  Flores-Navarro continued to collect belongings in the motel room.  Officer Sumner did not repeat his request.

They continued collecting their belongings in bags and boxes, while the three officers and Ms. Latham remained outside and watched.  Defendant walked out of the room with another shopping bag to her van.  At one point, when defendant was at her van and Flores-Navarro was out-of-sight in the room, Officer Sumner whispered, "That guy makes me super nervous."  Ms. Lantham asked Officer Sumner, "Do you want me to go in?"  From Officer Cogswell's recording, it appears Officer Sumner motions toward the door, and says, "You are welcome to."  Ms. Lantham walked into the room back toward the bathroom, looked all around the room, and walked out as defendant walked back in.

During this time, neither defendant nor Flores-Navarro attempted to shut the door or asked if they could shut the door.

### N.  Discovery of Flores-Navarro's Used Marijuana Pipe

As Ms. Lantham exited the motel room, defendant returned.  Defendant picked up some things from the bed, and a glass pipe dropped from the things onto the floor.  Defendant picked it up and said it was Flores-Navarro's.

### O.  Officer Sumner's Continued Encounter with Flores-Navarro

Defendant spoke in Spanish with Flores-Navarro.  Officer Sumner asked Flores-Navarro whether the pipe was his, and he eventually admitted that it was.  He said he had smoked marijuana with it two days earlier.  Officer Sumner asked the motel manager if it was okay if Flores-Navarro stayed out of the room, and Ms. Lantham agreed that was best.

### P.  Flores-Navarro's Admission

Defendant stepped out and said there was one more trip to the car, and Officer Sumner asked Flores-Navarro whether there was anything else in the room.  Flores-Navarro eventually said that there was a gun under the pillow.  Defendant seemed shocked to learn that there was a firearm under the pillow.

### Q.  Defendant's Consent to Search

Officer Sumner said he would not let her back in the room, and he asked if he could go in to get the gun.  Defendant consented.  Officer Sumner said that he wanted to let her know she already refused consent, she said she understood and said it was fine.  After searching, Officer Sumner found a loaded 9mm pistol, which they later learned had been reported stolen from Kansas City, Kansas.

### II.    Discussion

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  It "does not proscribe all contact between the police and citizens, but is designed 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'"  *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976)).  There are three categories of citizen-police encounters:  (1) consensual encounters, which are not seizures and do not implicate the Fourth Amendment; (2) investigative

detentions, which must be justified by reasonable, articulable, and individualized suspicion; and (3) arrests, the most intrusive of Fourth Amendment seizures, only reasonable if supported by probable cause. *See United States v. White*, 584 F.3d 935, 944–45 (10th Cir. 2009). Once defendant shows that a seizure occurred, the government bears the burden of demonstrating that it was reasonable. *United States v. Turner*, 553 F.3d 1337, 1344 (10th Cir. 2009) (citation omitted). A consensual encounter can transform into an investigative detention if, in light of the totality of the circumstances, a reasonable person no longer believes she is free to leave or otherwise end the encounter. *See Florida v. Bostick*, 501 U.S. 429, 437 (1991).

The court must analyze each stage of the encounter between defendant and the officers to determine its legality under the Fourth Amendment. Here, three main parts of the encounter are key to the court's analysis: (1) the period of time from defendant's initial consent to talk with the officers until Officer Sumner's calling for backup; (2) Officer Sumner's calling for backup in front of defendant to defendant's eviction; and (3) defendant's eviction. The court examines each time period below.

### A. Defendant's Encounter with the Officers Until Officer Sumner Called for Backup

The court first looks to the period of time from when defendant consented to Officers Sumner and Cogswell entering her motel room up until when Officer Sumner called for backup. This part of the encounter lasted approximately eighteen minutes. The court does not believe that the consensual encounter transformed into a detention during this time. Although Officer Sumner did not ask defendant whether he could reenter the motel room after addressing the initial issues involving her van and the marijuana pipe, defendant did not object. Defendant walked out of the room to smoke, and while Officer Cogswell followed her, he did not restrict her freedom. According to the body camera footage, defendant appeared to voluntarily answer questions and Officer Sumner did not appear to

overtly control her movements.  Although Officer Sumner repeatedly asked for permission to search under the pillow and it was late in the evening, the court believes that under the totality of the circumstances, a reasonable person in defendant's position would have felt free to end the conversation.

### B.  Defendant's Encounter After Officer Sumner Called for Backup

Next, the court looks to the period of time from when Officer Sumner called for backup.  The court believes it was during this time that defendant's consensual encounter turned into a detention.  After telling defendant that smoking was illegal in motel rooms in Lenexa, Officer Sumner called for backup on his radio, signaling to defendant that another officer was on the way.  Defendant offered to spray Febreeze in the room and Officer Sumner responded that she would have to stand by.  Defendant offered to leave the room, but Officer Sumner did not respond.  This signaled to defendant, and any reasonable person in her position, that she was not free to leave, she was not free to return to the motel room for purposes of leaving, and she was not free to spray Febreeze in her motel room.

Officer Sumner's restrictions on defendant become even more obvious when defendant tried to walk back onto the sidewalk, which appears to be mere feet away from Officer Sumner, and Officer Sumner told defendant, "Do you mind standing over here?  Is that okay?"  It is not particularly relevant that Officer Sumner phrased this as a question.  Under the totality of the circumstances, the court does not believe a reasonable person in her position would feel she could leave or ignore Officer Sumner's request.  Therefore, the court finds that defendant was seized for purposes of the Fourth Amendment.  The facts support that the original consent encounter therefore transformed into an intermediate seizure, or a detention requiring reasonable suspicion.

Upon finding that defendant was detained, the court looks to whether defendant's detention was reasonable under the circumstances.  An intermediate detention, like here, requires reasonable

suspicion.  *White*, 584 F.3d at 945.  The court looks to the totality of the circumstances to see whether

the detaining officer had reasonable suspicion, or a "particularized and objective basis" for suspecting

legal wrongdoing.  *United States v. Arivizu*, 534 U.S. 266, 273 (2002).  Even if the detention is based

on reasonable suspicion, the "scope of the duration must be carefully tailored to its underlying

justification."  *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality).  The government bears the

burden of proving that the seizure was reasonable.  *White*, 584 F.3d at 944.

The government argues that there was evidence that defendant had violated the Lenexa

ordinance banning smoking.  The record supports that defendant admitted to smoking in the motel

room, and Officer Sumner testified that Lenexa City Ordinance 3-5-F-3(F)(4) prohibits smoking in

motel and hotel rooms.  Detentions under the Fourth Amendment, however, must be "no longer than is

necessary to effectuate the purpose of the stop."  *Maresca v. Bernalillo Cnty.*, 804 F.3d 1301, 1309

(10th Cir. 2015).  Here, defendant's detention exceeded a reasonable scope and duration.

The penalty for violating this city ordinance is a fine ranging from $100 to $500, not arrest.

*See* Lenexa City Ordinance 3-5-F-6(A).  Although Officer Sumner could reasonably detain defendant

long enough to write her a ticket for violating the Lenexa City Ordinance, he chose to not ticket her.

Instead Officer Sumner chose to detain defendant until Officer Wohmer arrived.  Then, Officers

Cogswell and Wohmer, at Officer Sumner's direction, continued to detain defendant while Officer

Sumner left to talk with Ms. Latham about the smoking violation.  This exceeded the reasonable scope

of a detention for violating the city smoking ordinance.  And, the court is unaware of any legal

justification for officers to detain a citizen before anticipated eviction.

It also was not reasonable to detain defendant at this point for Officer Sumner's suspicions of

what was under Flores-Navarro's pillow.  Most of the facts offered by the government to support

reasonable suspicion regarding an item under the pillow related exclusively to Flores-Navarro.  For

instance, Flores-Navarro gave inconsistent answers regarding his identity, suggesting evasiveness. Flores-Navarro also said he did not have a Social Security number or any identification, which led Officer Sumner to believe he might be an unlawful alien.  Flores-Navarro seemed nervous and seemed to be hiding something under the pillow, and when he rose to allow Officer Sumner to frisk him, Flores-Navarro appeared to push something under the pillow to hide it.  None of these facts relate to or give rise to particularized reasonable suspicion as to defendant.  Furthermore, defendant seemed shocked to find that Flores-Navarro gave inconsistent names, spoke English, and seemed to be lying to her, weighing against any suggestion of complicity.

The only facts that arguably supported suspicion of illegal conduct as to defendant were the unused marijuana pipe and butane torch in her vehicle (although at this point in the detention, there was no evidence of actual drug use).  While these items might give some suspicion that defendant was a drug user, they do not give rise to particularized reasonable suspicion that defendant was involved with whatever was under Flores-Navarro's pillow.  Because factors related exclusively to Flores-Navarro played heavily into Officer Sumner's analysis, the government has not met its burden to show that the unused marijuana pipe and butane torch alone support a finding of reasonable, articulable, and particularized reasonable suspicion of defendant's involvement with what Officer Sumner suspected was under Flores-Navarro's pillow.  *Cf. Cortez v. McCauley*, 478 F.3d 1108, 1123 (10th Cir. 2007) (in case brought under 42 U.S.C. § 1983, discussing that factor causing some suspicion that plaintiff's husband had committed a crime did not support plaintiff's detention when the factor did not implicate her).

### C.  The Eviction and Consent to Search

Next, the court looks to constitutional implications during the eviction.  Officer Sumner testified that he went to speak with Ms. Latham to tell her what he had observed in the room because,

"[s]he knew we were already down there, so in regards to the smoking, I told her about that, I mean, because honestly that's all I had, was they were smoking in the room."  Officer Sumner testified that smoking in the motel room violated Motel 6 guest policy in addition to Lenexa City Ordinance 3-5-F-3(F)(4).  Officer Sumner did not testify, and the government did not provide any evidence supporting, that such a smoking violation would usually warrant immediate eviction with officer support.  Nonetheless, the court will assume that the motel manager had such a policy to immediately evict guests upon finding they were smoking.

At the hearing, Officer Sumner testified that he and the other officers were not detaining defendant throughout the eviction process, but rather, they were only there to provide oversight to Ms. Latham and make sure things went smoothly at Ms. Latham's request.  This would suggest that any illegal detention of defendant ended when the eviction began.  The court does not agree with this characterization, however.  Although Ms. Latham, the motel manager and presumably not a state actor, requested defendant to check out and arguably effected the eviction, the court does not believe defendant's detention ended during this time.  The officers had detained defendant continuously since Officer Sumner called for backup.  Without any break in officer oversight during this time, no reasonable person in defendant's position would believe that her detention ended when the eviction process began.  In other words, no reasonable person in defendant's position would feel under the circumstances that she could ignore officer requests during the eviction process.  Therefore, defendant was continuously wrongfully detained through the eviction process.

### D.  Causation Between Defendant's Detention and the Recovered Firearm

In the Tenth Circuit, there must be a "causal link between the violation and the contraband." *United States v. DeLuca*, 269 F.3d 1128, 1135 (10th Cir. 2001).  If the evidence ultimately found in the vehicle is the fruit of the defendant's illegal detention, then the defendant will have standing to seek

suppression.  *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000).  To prevail under this theory, however, the defendant must meet a two-pronged burden.  She must not only show that her original detention violated the Fourth Amendment, but also that there was a "factual nexus between the illegality and the challenged evidence."  *Id.* at 1131.  If defendant can show that the evidence would not have been found but for her—and only her—detention, then the burden shifts to the government to show that the evidence is not the fruit of the poisonous tree.  *DeLuca*, 269 F.3d at 1133.  Here, defendant has met her burden to show that but for her illegal detention, defendant could have packed up her belongings and left the motel without officer oversight and scrutiny long before Ms. Latham approached to evict defendant and Flores-Navarro.  Therefore, defendant satisfies her prima facie burden that the evidence she seeks to be suppressed is causally connected to the illegal detention.

The court has considered that defendant may have no longer had a privacy interest in her motel room at the time she was evicted, thus making discovery inevitable or alleviating the need for the officers to acquire defendant's consent to search.  It is the government's burden, however, to show here that defendant no longer had a privacy interest in the room at this time, and the government made no such showing.  Furthermore, the court doubts that defendant's privacy interest in the room would end at the exact moment the motel manager told her she must check out.  Even if her privacy interest did end at that time, the court does not believe this would break the chain of causation because, if defendant had been permitted to leave instead of being detained before and while Officer Sumner informed Ms. Latham of the smoking violation, defendant could have gathered her belongings in the privacy of her room and left the motel, as she had suggested to Officer Sumner.  Thus, "but for" defendant's illegal detention, she would not have been evicted under conditions requiring her to gather her belongings while being watched by three police officers and the motel manager.

The court has also considered whether Flores-Navarro's eventual confession of the firearm's location under the pillow was an intervening circumstance sufficient to break the chain of causation. Under the circumstances, it appears Flores-Navarro's confession was related to either the overseen eviction process, the discovery of Flores-Navarro's marijuana pipe, or both. Because neither of these events would have occurred "but for" defendant's unlawful detention, the court does not believe Flores-Navarro's confession "purges the taint" of defendant's unlawful detention.

Finally, the government argues that defendant consented to the search. Voluntary consent may be given by a person who is detained. *See United States v. Flores*, 48 F.3d 467, 469 (10th Cir. 1995). If the consent is given after an illegal detention, however, the government carries a heavy burden to show that "the primary taint of the illegal stop was purged so that the subsequent consent was voluntary in fact." *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996) (citing *United States v. Fernandez,* 18 F.3d 874, 881 (10th Cir. 1994)). To satisfy this burden, the government must prove from the totality of the circumstances a sufficient attenuation or "break in the causal connection between the illegal detention and the consent." *United States v. McSwain,* 29 F.3d 558, 562 n.2 (10th Cir. 1994). When examining the totality of the circumstances, no single fact is dispositive. *Fernandez,* 18 F.3d at 882. Three particularly significant factors are: (1) the temporal proximity of the illegal seizure and the consent; (2) any intervening circumstances; and (3) the purposeful or flagrant misconduct of the officer. *Id.* (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).

Here, the first two factors strongly favor that the taint of defendant's illegal detention was not purged. First, the court found that defendant's detention continued through her eviction. Therefore, the consent occurred contemporaneously with the illegal detention or within minutes of discovering

Flores-Navarro's marijuana pipe.[4]  For the same reason, there were no intervening circumstances sufficient to break the causal connection.  Although the officers' conduct does not suggest flagrant or purposeful misconduct, the first two factors strongly support a finding that that the primary taint of defendant's illegal detention was not purged.  Therefore, the evidence acquired from the search is the fruit of defendant's unlawful detention and must be suppressed.[5]

For these reasons, the firearm found at the end of defendant's unlawful detention was the fruit of her unlawful detention and must be suppressed.  The court therefore grants defendant's Motion to Suppress (Doc. 28).

**IT IS THEREFORE ORDERED** that defendant's Motion to Suppress (Doc. 28) is granted.

Dated this 23rd day of June, 2016, at Kansas City, Kansas.

 _s/ Carlos Murguia_____
**CARLOS MURGUIA**
**United States District Judge**

---

[4] Discovery of Flores-Navarro's marijuana pipe arguably could give rise to reasonable suspicion as to defendant; however, the officers would not have seen the pipe in plain view "but for" defendant's continuous illegal detention.  In any event, the government did not make this argument.

[5] Furthermore, the government has made no showing, and the record does not support that discovery of the firearm or Flores-Navarro's confession was inevitable.  The officers did not have probable cause to support a warrant or a warrant exception to search under the pillow until Flores-Navarro's confession or, at the earliest, when his marijuana pipe fell from defendant's belongings.  Regardless, neither of these events occurred until long into defendant's illegal detention, and long after defendant had offered to leave and Officer Sumner did not respond.